Thompson O. LIVINGSTON

v.

SHREVEPORT–TEXAS LEAGUE BASE-BALL CORPORATION.

Civ. A. No. 4764.

United States District Court,
W. D. Louisiana, Shreveport Division.
Feb. 5, 1955.

192

Bullock & Bullock, Shreveport, La., for plaintiff.

Tucker, Bronson & Martin, Shreveport, La., for defendant.

DAWKINS, Jr., Chief Judge.

Thompson Orville ("Mickey") Livingston here sues Shreveport-Texas League Baseball Corporation ("The Shreveport Sports") for alleged breach of contract. Jurisdiction is invoked under the Diversity Statute.[1]

For a cause of action plaintiff alleges that on October 1, 1953, by written contract, defendant employed him as its "Playing Manager" for the baseball year 1954; that his salary was to be $1,200 per month for the scheduled playing season of seven months, plus $1,000 should the club team " * * * be in the Texas League Play-Off, and an additional $1,000.00 should it be in the Dixie Series Play-Off".

He then alleges that on November 30, 1953, defendant discharged him " * * * without cause, and sought to terminate his said contract, serving upon him the

1. 28 U.S.C.A. § 1332. Plaintiff alleges he is a citizen of South Carolina, and that defendant is a Louisiana corporation domiciled in this District and Division.

notice attached hereto and made part hereof * * * ", which reads:

"You are hereby notified that you are released outright and unconditionally for the reason that, subsequent to signing a contract as manager of the Shreveport Club, you purchased and are operating a business in the Jefferson Hotel at Shreveport. This business was purchased by you without consultation with or permission of this club, and it is the position of this club that your interest in this business will necessarily preclude your giving the full attention to your managerial duties which are contemplated by the contract."

The business referred to is a saloon, called "Mickey Livingston's Bar and Cocktail Lounge". It is located just off a major thoroughfare in downtown Shreveport. A large sign attracts public attention to it.

Quoting from the contract, which is attached to and made part of the complaint, plaintiff relies, at least in part, on the following clause:

"The Club and Manager agree that in the event the Club exercises its right to terminate this contract by unconditional release of the Manager in accordance with Paragraph 5(b) hereof, the Club shall be liable to the Manager for all salary and any other compensation set forth herein, for the full term of the contract, and that such liability shall not be reduced becaue [sic] of any earnings which accrue to the Manager during the remainder of the contract term, provided, however, that if, during said contract term, said Club shall cease to operate for any reason, then the liability of the Club shall terminate forthwith, anything to the contrary herein notwithstanding."

Apparently laboring under the impression that he was required to exhaust all remedies afforded by the contract before he would have any standing in Court, plaintiff alleged that:

"Subsequent to defendant's violation and breach of its contract on Nov. 30, 1953, as alleged, plaintiff fully complied with each and all the provisions of paragraphs 7 and 8 of the regulations of said contract, as follows:

"1. In December, 1953, filed his claim with Alvin Gardner, President of the Texas Baseball League, who refused to pass upon it;

"2. Within 30 days after such refusal by the President of the Texas League, appealed to George M. Trautman, President of the National Association of Professional Baseball Leagues, which appeal was denied;

"3. Within 30 days after such denial by the President of the National Leagues, appealed to the Executive Committee of the National Association of Professional Baseball Leagues, composed of Herman D. White, Chairman, Thomas H. Richardson, Member, and F. J. Shaughnessy, Member, which appeal was denied;

"4. Within 30 days after such denial by the Executive Committee, appealed to Ford C. Frick, Commissioner of Baseball, which appeal was denied."

He then averred that "The Sports" played in the Texas League 1954 Play-Off, but not in the Dixie Series. Accordingly, he contends he is entitled to be paid by defendant at the rate of $1,200 per month for the seven-month regular season, or $8,400, plus $1,000 for the Texas League Play-Off—a total of $9,400. His prayer is for that amount, with interest from judicial demand.

Defendant has moved to dismiss. In support it has attached certain documents, which make it a "speaking" motion that will be treated as one for summary judgment.[2] These documents are:

2. Rule 12(b), Fed.Rules Civ.Proc., 28 U.S. C.A.

I. Duplicate original of the contract between plaintiff and defendant, dated October 1,1953.

II. Duplicate original of Notice of Dismissal, dated November 30, 1953, sent by defendant to plaintiff, with Registered Mail return receipt signed by plaintiff's wife on December 2, 1953.

III. Photostatic copy of petition by plaintiff, dated December 14, 1953, to the President of the Texas League; and photostatic copy of petition by plaintiff, dated December 16, 1953, addressed to George M. Trautman, President of the National Association of Professional Baseball Leagues.

IV. Letter from Mr. Trautman, dated December 18, 1953, addressed to defendant, enclosing photostatic copies of the foregoing petitions, and requesting a statement of the position of the Shreveport Club.

V. Copy of defendant's letter dated December 21, 1953, signed by Bonneau Peters, its President, addressed to Mr. Trautman, setting forth defendant's position in the controversy.

VI. Copy of letter from Mr. Trautman in his official capacity, dated December 28, 1953, addressed to plaintiff, quoting the pertinent portions of Mr. Peters' letter, and denying plaintiff's claim. This letter also advised plaintiff of his right to appeal to the Executive Committee; and, should the latter affirm the decision, to appeal to Commissioner Frick.

VII. Decision of the Executive Committee dated February 1, 1954, affirming Mr. Trautman's decision; and letter from Mr. Trautman transmitting this to plaintiff, advising him of his right to appeal within 30 days to the Commissioner.

VIII. Letter from Mr. Frick, Baseball Commissioner, dated February 26, 1954, addressed to plaintiff, sustaining the decisions of Mr. Trautman and the Executive Committee, and denying plaintiff's claims.

IX. Affidavit of Mr. Peters, and the 1954 Baseball Blue Book, containing the National Code of Baseball, explained *infra*.

Plaintiff has filed no affidavits or other papers in opposition.

The motion regularly came on for hearing and was submitted for decision on briefs filed by the parties, both agreeing that purely a legal question is presented, there being no dispute on the essential facts.

■ The point of defendant's motion is that the parties to the contract, plaintiff and defendant, provided for any disputes arising out of it to be arbitrated; that the contract named the officials who would serve as arbitrators and agreed that their decision would be final; that all basic facts and contentions relating to plaintiff's claim and defendant's opposition to it actually have been submitted to the arbitrators, who have entered an award denying the claim *in toto;* that their action is final, complete and binding, by the terms of the contract and as a matter of law; and, accordingly, that plaintiff is without legal right to challenge the award.

The particular contract clause upon which defendant relies reads:

"Disputes 11. In case of dispute between the Player and the Club arising under the provisions of this contract, the same shall be referred to the Executive Committee or the President of the National Association, as an arbitrator, and the arbitrator's decision shall be accepted by all parties as final, subject only to such right of appeal as is given to the Player only, under the terms of the National Association Agreement and the Major-Minor League Agreement and Rules."

Defendant stands upon the Louisiana Arbitration Act, LSA–R.S. 9:4201 et seq.; in the alternative, upon articles 3099–3132 of the LSA–Civil Code, enti-

tled "Of Arbitration", and upon the Federal Arbitration Act, 9 U.S.C.A. §§ 1–14.

Plaintiff, on the other hand, argues: That parties, by private agreement, cannot oust courts of the jurisdiction vested in them by law, nor can they irrevocably debar themselves from appealing to the established tribunals of justice for determination of their substantive rights; that the law of arbitration is a part of the law of remedies, governed by the law of the forum, and that the Arbitration Statutes and Codal articles relied on by defendant are inapplicable; that since the President of the Texas League refused to act on the case, the other officials who did act were without jurisdiction and their action is without effect; that, in any event, their action was *ex parte*, plaintiff not having been furnished with a copy of defendant's answer and having had no opportunity to refute it; and that the decisions were based solely on defendant's version of the dispute and its statement of the facts, which are themselves contradictory to each other. Accordingly, plaintiff contends he is entitled to proceed with his lawsuit, the motion for summary judgment being without merit.

The contract is on a standard form, required by the so-called National Code of Baseball. In its opening paragraph is found this proviso:

"The League of which the Club is a member is a league of the National Association of Professional Baseball Leagues (hereinafter referred to as the 'National Association'). As such, and jointly with other clubs of its League, it is a party to the Constitution and By-Laws of the League of which it is a member, and is subject to and governed by the Agreement of the National Association of Professional Baseball Leagues (hereinafter referred to as the 'National Association Agreement'), and the Major-Minor League Agreement and Rules, between the National Association, on the one hand, and the American League of Professional Baseball Clubs and its constituent clubs and the National League of Professional Baseball Clubs and its constituent clubs, on the other hand. *The purpose of these Agreements, Rules, Constitutions and By-Laws is to assure the public wholesome professional baseball by defining the relations between Club and Player,* between Club and Club, between League and League, *and by vesting in a designated Commissioner of Baseball, in the Executive Committee and President of the National Association and in the League President, broad powers of control, of discipline, and of decision in case of disputes."* (Emphasis supplied.)

After reciting the term of employment and the amount of compensation to be paid, the contract covers the following pertinent subjects:

"3. (a) *The Player agrees to serve diligently and faithfully the Club,* or any other Club, to which this contract may be assigned, as provided in paragraph 6 hereof; to keep himself in first-class physical condition, *and to observe and comply with all requirements of the Club respecting conduct and service of its team and its players at all times, whether on or off the field; and pledges himself to the public to conform to high standards of personal conduct,* fair play and good sportsmanship.

"(b) In addition to his service in connection with the active playing of baseball, the Player agrees to cooperate with the Club and participate in any and all promotional activities of the Club and its League, which, in the opinion of the Club, will promote the welfare of the Club or Professional Baseball.

\* \* \* \* \* \*

"5. (a) The Player agrees that, while under contract and prior to expiration of the Club's right to renew the contract, for the purpose of avoiding injuries he will not play

baseball otherwise than for the Club, except that he may participate in postseason games as prescribed in the National Association Agreement.

"(b) The Player and the Club recognize and agree that the Player's participation in other sports may impair or destroy his ability and skill as a baseball player. Accordingly, the Player agrees he will not engage in professional boxing or wrestling and that, except with the written consent of the Club, he will not play professional football, basketball, hockey or other contact sport.

\* \* \* \* \* \*

"7. (a) If the Club is in arrears to the Player for any payments due him under this contract for more than fifteen (15) days, or if it fails for more than fifteen (15) days to perform any other obligation agreed to be performed by the Club hereunder, the Player shall be entitled to apply to the President of the National Association to terminate this contract, and if the Club shall fail to remedy such default as to such payment or other obligation within such time as the President may fix, the President shall terminate this contract by a declaration of free agency, but the Club shall remain liable to the Player for all payments due him at the date of such termination.

"(b) *The Club may terminate this contract upon written or telegraphic notice to the Player if the Player shall at any time:*

"(1) *fail, refuse or neglect to conform his personal conduct to standards of good citizenship* and good sportsmanship, or to keep himself in first-class physical condition, *or to obey the Club's requirements respecting his conduct and service;* or

"(2) fail, in the opinion of the Club's management, to exhibit sufficient skill or competitive ability to qualify or continue as a member of the Club's team; or

"(3) *fail, refuse or neglect to render his services hereunder, or in any other manner materially breach this contract.*

"(c) The Club may also terminate this contract as provided in Regulation 2 on Page Four. If so terminated by the Club by reason of the Player's disability resulting directly from injury sustained in the course and within the scope of his employment, and if written notice of such injury has been given by the Player, as provided in said Regulation, the Player shall be entitled to the payments and benefits set forth in said Regulation.

"8. *The Player and the Club accept as part of this contract the Regulations printed on Page Four hereof.*

"9. *The Club and the Player agree to accept, abide by and comply with all provisions of the Constitution and By-Laws of the League of which the Club is a member, of the Major-Minor League Rules, and of the National Association Agreement, which pertain to player conduct and player-club relations, and with all decisions of the Commissioner, of the President or Executive Committee of the National Association, and of the League President pursuant thereto.*

\* \* \* \* \* \*

"12. This contract is subject to Federal or State legislation, regulations, executive or other official orders, or other governmental action, now or hereafter in effect, which may directly or indirectly affect the Player, Club or the League, and subject also to the right of the Commissioner or the Executive Committee of the National Association to suspend the operation of this contract during any national emergency.

"13. The terms 'Commissioner', 'President of the National Association,' 'Executive Committee of the National Association' and 'League

President' shall mean the person or persons holding any such office or exercising the powers and duties of any such office, at any time during the term of this contract or any renewal thereof. * * *" (Emphasis supplied.)

Article 8 of the standard Regulations, referred to in paragraph 8 of the contract, reads as follows:

"Any claim which the Player may wish to present must be filed, in itemized or detailed form, with the President of the League of which the Club against which the claim is filed is a member, within 120 days of the maturity of the claim. If the League President's decision is adverse to the Player, the Player may appeal to the President of the National Association, whose decision shall be final, except that if the claim involves $300.00 or more, or free agency, the Player may appeal from such decision to the Executive Committee of the National Association and, additionally, from the decision of the Executive Committee to the Commissioner, whose decision shall be final. Any such appeal or appeals must, in each instance, be made within 30 days from the date of decision from which the appeal is taken."

The National Baseball Code, governing the great American sport, evolved from many years of practical experience. It is designed, by means of the several sets of Agreements and Rules referred to in the standard player contract, to avoid repetition of some of the scandals which beset the sport in its earlier days; and to that end to regulate relations between Leagues, between Leagues and Clubs, between Clubs and other Clubs, and between Clubs and Players, including the power to arbitrate, decide and settle finally all disputes. The Code is composed of 1) the Major League Agreement between the two Major Leagues and their sixteen constituent Clubs; 2) Major League Rules in Code Form, duly adopted, binding upon all the Major League Clubs; 3) Major-Minor League Agreement between the two Major Leagues on the one part and the National Association of Professional Baseball Leagues, otherwise known as the Minor Leagues, on the other part; 4) Major-Minor League Rules; and 5) National Association Agreement, being the binding contract between all of the official Minor Leagues, and their constituent Clubs, included within the National Association.

Defendant, as a member Club of the Class AA Texas League, is affiliated with the National Association of Professional Baseball Leagues (Minors), and as such is bound by the National Association Agreement; so are all of the defendant's officers, agents and players.

These Agreements and Rules, compliance with which is required by paragraph 9 of the Standard Player Contract executed by plaintiff and defendant here, constitute a complete governing Code for, or Charter and By-Laws of, organized professional baseball in America. They disclose a clear intent on the part of all concerned, including plaintiff and defendant here, to endow certain officials " * * * with all the attributes of a benevolent but absolute despot and all the disciplinary powers of the proverbial pater familias".[3]

After careful consideration of the number and the technical nature of problems involved in the sport, we are convinced that this is as it should be. Surely the officials designated are best qualified by training, experience and practical judgment to pass upon such matters; and, if it were otherwise—if all the persons and organizations in baseball were required to litigate their many differences —endless delays and undue burdens upon the courts certainly would result. Not unlike a military organization, in baseball there must be a set of governing

3. Language of Judge Lindley in Milwaukee American Ass'n, v. Landis, 7 Cir., 49 F.2d 298, 299.

rules through which these officials speedily may pass upon and finally decide the multitude of disputes inherent in the game.

In that respect we shall discuss, later in this opinion, the public policy and jurisprudence involved in the law of "Arbitration and Award", as it applies to this case, but before reaching that subject we must relate in some detail the undisputed facts found here.

As stated, the contract between plaintiff and defendant was executed on October 1, 1953. Sometime between then and November 10, 1953, the exact date not being shown, plaintiff bought the saloon in question. On the latter date, defendant's President, Mr. Peters, learned about the purchase and that plaintiff had applied for a license to sell liquor. He immediately went to the place of business to discuss the matter with plaintiff, but, finding him busy, said only a few words to him. On November 13th, however, a long talk was had between them, in the course of which Mr. Peters advised plaintiff that this business was inconsistent with his duties and obligations to the Ball Club, and to the Shreveport public. Plaintiff then asked for, and was granted, a week within which to dispose of it.

They had an engagement to meet again in the Club office at the Ball Park on November 17th, but plaintiff did not show up. Nothing further was heard from him until November 23rd, when Mr. Peters called him and was advised by plaintiff that he had been unable to sell the business. He was told that a definite answer had to be received by November 27th, at which time plaintiff was to call Mr. Peters at Atlanta, Georgia, where he was going to attend the annual meeting of the National Association, and advise what action had been taken. On that date, plaintiff called Mr. Peters and told him he could not and would not get out of the business; but went on to request permission to remain in it until January 1, 1954. Mr. Peters declined. He also advised plaintiff that he would have to give him an unconditional release, since it was necessary that he proceed with concrete plans for the 1954 season.

He then asked plaintiff to resign, but the latter refused. Meantime, on November 16th, the Club Board of Directors had authorized Mr. Peters to take any and all necessary action. In keeping with that authority, on November 30th he prepared the dismissal notice and sent it to plaintiff by Registered Mail, it being received on December 2nd.

On December 14th, plaintiff personally presented a rather lengthy petition to Mr. Alvin Gardner, the then President of the Texas League, praying for cancelation of the release and reinstatement of his contract. Alternatively, if the release were found to be justified, he asked for a reasonable time within which to dispose of the business " *   *   * without the ruin and loss of his savings"; that he be allowed until the beginning of the playing season, or at least until the following March 1st, when the training season was to start, to sell the business; and that, upon disposal of it within that interval, his contract be reinstated. In the further alternative, he prayed that defendant be ordered to pay him the full salary for the full term of the contract.

Without going into all the details set forth in the petition, its substance was to the effect that plaintiff was given only two days' notice within which to sell the business in which he had invested his life's savings of $5,000—an impossible requirement; that there was nothing in the contract prohibiting such an investment; that, since baseball is a precarious business, it is necessary for those employed in it to make "wise" investments such as this; that any inattention or inapplication to his job as Playing Manager, which might result from his ownership of the business, had not yet occurred; that he had served the Club faithfully for the previous two years; and that the business was " *   *   * located in the Jefferson Hotel in Shreveport where he will always be accessible to the officials of the Club for consultation, advice and action in season or out".

He did not state in his petition, and does not now contend, that he had consulted the Club management in advance regarding his proposed purchase. Instead, he argued merely that defendant's position regarding inattention to his managerial duties was a mere conclusion, anticipatory and not factual.

Mr. Gardner refused to act on the petition. Therefore, on December 16th, plaintiff appealed to the President of the National Association, Mr. Trautman, who wrote defendant on December 18th requesting a statement of its position. This was transmitted by Mr. Peters in a letter dated December 21st. On December 28th, after full consideration of the contentions made by both parties, Mr. Trautman wrote plaintiff, with a copy to defendant, quoting the exact pertinent language from Mr. Peters' letter of December 21st, wherein defendant's position was stated. He then concluded:

"The decision of this office must be that the release issued to you was a proper one. Your petition states that 'The allegation that this fact (the operation of a business) will necessarily preclude his (your) giving his (your) full attention to his (your) managerial duties is purely a conclusion of the Shreveport Club not based upon any fact and entirely inconsistent with his (your) two previous years of faithful service as manager of the Shreveport Club.' While it may be true that the allegation in question is a 'conclusion', such a conclusion is, in my opinion, a reasonable one in that it conforms precisely to the axiom that 'no man can serve two masters.' Obviously the Shreveport Club had a right to expect that you would devote your full attention to your managerial duties and clearly the club is correct in concluding that your engaging in any other business without its consent would work against its interests.

"It is unfortunate that you did not consult the Shreveport Club prior to the time the business in question was purchased by you, for there is no doubt but that Shreveport would have disapproved. I must hold that you are chargeable with having known of the general principle involved in this case and that it was your own failure to consult the Shreveport Club, rather than any unreasonableness on the part of Shreveport, which resulted in the release.

"Your claim is hereby denied. Under the rules, you have a right to appeal to the Executive Committee, provided written notice of such appeal is received at this office within 30 days from date hereof. Should you appeal and should the Executive Committee affirm my decision, you will have a further right of appeal to Commissioner Frick."

Plaintiff then appealed to the Executive Committee of the National Association, which on February 1, 1954, rendered the following decision:

"After careful consideration of the file in the above entitled appeal, it is the conclusion of the Executive Committee that the manager in purchasing a bar and cocktail lounge at the Jefferson Hotel in the City of Shreveport did so without the knowledge and consent of the Shreveport Club:

"That such knowledge and consent should have been requested before such purchase was made:

"That such purchase could conceivably cause division of effort and attention so that the ball club would not receive the full time and effort of the manager:

"That inasmuch as notice prior to release was given to the manager and that he made no disposition or cancellation of his purchase:

"That inasmuch as release was given very shortly after contract had been filed, manager was free to seek employment with any other Club in Baseball:

"Therefore; it is the decision of the Executive Committee that the decision of the President, Mr. Trautman, should be upheld and this Committee so decides."

Thereafter, plaintiff appealed to Commissioner Frick, who wrote plaintiff on February 26, 1954, as follows:

"This Office has been furnished with a complete file of all records and correspondence in connection with your appeal from the decision of the National Association Executive Committee.

"In our study of the evidence we find no reason to conclude that any facts in the case have been misinterpreted; or that complete consideration has not been given to all factors.

"Under the circumstances the original decision of the President of the National Association, which was concurred in by the Executive Committee on appeal, is sustained by the Commissioner."

It is to be noted, at this point and later, that at no time while his case was pending before these officials did plaintiff request an opportunity personally to appear before them or to present further relevant facts in his behalf. Indeed, we cannot conceive of any other facts that could have been presented, or that could be shown in this Court. Neither did he object at any time to the methods employed by the officials in passing upon the controversy; and as to their jurisdiction, he himself invoked it by his own petition and successive appeals.

This brings us finally to a discussion of the law which we believe to be applicable here:

■ In Louisiana, where this contract was confected, and in most jurisdictions, it long has been an established public policy to favor arbitration. In fact, the

Louisiana Civil Code of 1808 contained a section entitled "Of Arbitration" [4] almost identical to the present provisions. The LSA Constitution of 1921, at article 3, § 36,[5] provides:

"It shall be the duty of the Legislature to pass such laws as may be proper and necessary to decide differences, with the consent of the parties, by arbitration."

LSA–R.S. 9:4201, the first section of the present Arbitration Law (an addendum to the Code articles), reads:

"A provision in any written contract to settle by arbitration a controversy thereafter arising out of the contract, or out of the refusal to perform the whole or any part thereof, or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

The latest decision of the Louisiana Supreme Court on this subject is Housing Authority of New Orleans v. Henry Ericsson Co., 197 La. 732, 2 So.2d 195, 200, wherein it was said:

"The primary purpose of the Louisiana arbitration statute is to enforce agreements to arbitrate and the awards of the arbitrators."

Looking elsewhere, the general rule in other jurisdictions, according to Corpus Juris Secundum,[6] is to favor the device:

"The settlement of controversies by arbitration is a legally favored contractual proceeding of common law origin by which the parties by consent submit the matter for determination to a tribunal of their own choosing in substitution for the

4. See Historical Note under Civil Code art. 3099, Dart's Louisiana Civil Code, 2d Ed.

5. Similar provisions were included in the Constitution of 1812, art. 6, § 6; of 1845,

art. 94; of 1852, art. 95; of 1864, art. 97; of 1879, art. 165; of 1898, art. 176; of 1913, art. 176.

6. 6 C.J.S., Arbitration and Award, § 1, p. 152.

tribunals provided by the ordinary processes of the law; \* \* \*."

In the Federal field, Congress has recognized the desirability of arbitration by enactment of the Federal Arbitration Act, 9 U.S.C.A. §§ 1–14. The United States Supreme Court, commenting upon this law, had the following to say in Wilko v. Swan, 1953, 346 U.S. 427, 431, 74 S.Ct. 182, 185, 98 L.Ed. 168:

> "The United States Arbitration Act establishes by statute the desirability of arbitration as an alternative to the complications of litigation. The reports of both Houses on that Act stress the need for avoiding the delay and expense of litigation, and practice under its terms raises hope for its usefulness both in controversies based on statutes or on standards otherwise created."

■ The Louisiana Arbitration Law, at art. 9:4216, provides:

> "Nothing contained in this Chapter shall apply to contracts of employment of labor or to contracts for arbitration which are controlled by valid legislation of the United States or to contracts made prior to July 28, 1948."

In our opinion, however, this exclusion does not apply to the present case. An annotation found at 129 A.L.R. 965, entitled "Construction and Application of Provisions of general arbitration statutes excluding from their operation contracts for labor or personal services", reads as follows:

> "In construing a provision in an arbitration statute that it 'shall not apply to contracts pertaining to labor', it has been held that the word 'labor' does not include the performance of mental tasks, or the services or those recognized generally as professional men or women.

> "Then in Universal Pictures Corporation v. Superior Court, (1935) 9 Cal.App.2d 490, 50 P.2d 500, the court, in adhering to this rule, held that a contract for the employment of a motion picture actor to perform in the production of a photoplay for a salary of $1000.00 per week came within the Arbitration Statute, since it was not a contract pertaining to labor. The Court said: 'It seems to be generally conceded that individuals whose principal efforts are directed to the accomplishment of some mental task \* \* \* or those persons generally known or recognized as professional men or women, even though in its broad sense, perform "labor", are not to be, nor should be, classified as "laborer", \* \* \*. In its present connection, the meaning that should be attributed to the word is that it applies to that kind of human energy wherein physical force, or brawn and muscle, however skillfully employed, constitute the principal effort to produce a given result, rather than where the result to be accomplished depends primarily upon the exercise of the mental faculties'."

In determining the meaning of the term "labor" under the Arbitration Law, an examination of its historic meaning in connection with a baseball player is pertinent. The definition of "baseball" found in 9 C.J.S., p. 1554, is:

> "Baseball. A game of ball, so called from the bases or bounds (usually four in number) which designate the circuit which each player must make after striking the ball. It is primarily and properly a game of science, of physical skill, of trained endurance, and of natural adaptability to athletic skill, being to America what cricket is to England; hence, in construing particular statutes, it has been held \* \* \* even when played for a remuneration, not to constitute 'labor' \* \* \*."

■ Here we have a "playing manager" who played only occasionally [7] and

---

7. It is a matter of common knowledge in Shreveport, properly subject to judicial notice, 20 Am.Juris., verbo "Evidence", §§ 18, 20, 77, that plaintiff played as a catcher on the team, not regularly, but only occasionally.

whose real value to the team lay in his mental skill, his personality and leadership qualities, and his general managerial abilities, including his knowledge and application of the fine points of the game. We conclude, therefore, that the services *to be performed by him, in contemplation of the contract, did not constitute "labor"* so as to be excluded from the substantive effects of the Louisiana Arbitration Law.

■ While it is true that arts. 9:-4202-9:4215 of this law are procedural or remedial, as plaintiff urges, and could not be enforced in this Court, still it is inescapable that the provisions of § 4201, and the applicable LSA–Civil Code articles, are substantive in character. They give legislative sanction to the validity and enforceability of arbitration agreements generally, and to this one in particular. It is our judgment, accordingly, and we hold, that the Louisiana Arbitration Law does apply to this case. Since the contract does not involve interstate commerce,[8] we are of the further opinion that the Federal Arbitration Act, supra, is not pertinent.

■ Having recognized the validity of the Arbitration Agreement, we now proceed to the points raised by plaintiff in opposition to the enforceability of the award. His first and major argument is to the effect that parties, by private agreement, cannot oust regularly constituted courts of jurisdiction to try, and decide, their substantive rights or claims. This is a correct statement of the general rule, but like most others it carries with it an important exception: where an agreement to arbitrate has been executed fully, and is no longer merely execu-tory, courts universally have held that the award is binding, having the force of *res adjudicata*. As was said in Milwaukee American Association v. Landis, supra:

"It is asserted that this wide grant of jurisdiction of the commissioner is an attempt to deprive the court of its jurisdiction and that such a provision as is contained in these agreements, rules and uniform contract is contrary to public policy. No doubt the decision of any arbiter, umpire, engineer, or similar person endowed with the power to decide may not be exercised in an illegal manner, that is fraudulently, arbitrarily, without legal basis for the same or without any evidence to justify action. The many cases cited upon the power and jurisdiction of such officials are not in serious conflict. An agreement to arbitrate a controverted question and to deprive all courts of jurisdiction, so long as in executory form, is quite commonly held void, but an actual submission to an arbiter or umpire in good faith is proper, and decision under same is binding, unless it is unsupported by evidence, or unless the decision is upon some basis without legal foundation or beyond legal recognition."

The United States Supreme Court, and other courts in other jurisdictions,[9] uniformly have recognized and enforced this principle:

"The federal courts—like those of the states and of England—have, both in equity and at law, denied, in large measure, the aid of their

8. See Conley v. San Carlo Opera Company, 2 Cir., 1947, 163 F.2d 310, where it was held that a contract for the services of an opera singer, requiring travel through various States, giving performances, was not "commerce" within the meaning of the Federal Arbitration Act. See also Federal Baseball Club of Baltimore v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898, holding that baseball is not "commerce;" reaffirmed, Toolson v. New York Yankees, Inc., 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64.

9. Burchell v. Marsh, 17 How. 344, 58 U.S. 344, 15 L.Ed. 96; York & C. R. Co. v. Myers, 18 How. 246, 59 U.S. 246, 15 L.Ed. 380; N. P. Sloan Co. v. Standard Chemical & Oil Co., 5 Cir., 256 F. 451; Mutual Benefit Health & Accident Ass'n v. United Cas. Co., 1 Cir., 142 F.2d 390, certiorari denied, 323 U.S. 729, 65 S.Ct. 65, 89 L.Ed. 585; 6 C.J.S., Arbitration and Award, § 94, p. 238, et seq.

processes to those seeking to enforce executory agreements to arbitrate disputes. They have declined to compel specific performance, Tobey v. County of Bristol, Fed.Cas.No. 14,065, 3 Story 800, 819–826; or to stay proceedings on the original cause of action. Story, Equity Jurisprudence, § 670. They have not given effect to the executory agreement as a plea in bar, except in those cases where the agreement, leaving the general question of liability to judicial decision, confines the arbitration to determining the amount payable or to furnishing essential evidence of specific facts, and makes it a condition precedent to the cause of action. Hamilton v. Liverpool, London & Globe Insurance Co., 136 U.S. 242, 255, 10 S.Ct. 945, 34 L.Ed. 419; Martinsburg & Potomac R. R. Co. v. March, 114 U.S. 549, 5 S.Ct. 1035, 29 L.Ed. 255. *But an agreement for arbitration is valid, even if it provides for the determination of liability.* If executory, a breach will support an action for damages. Hamilton v. Home Insurance Co., 137 U.S. 370, 385–386, 11 S.Ct. 133, 34 L.Ed. 708. *If executed—that is, if the award has been made—effect will be given to the award in any appropriate proceeding at law, or in equity.* Karthaus v. Ferrer, 1 Pet. 222, 7 L.Ed. 121, Durchell v. Marsh, 17 How. 344, 15 L.Ed. 96; Bayne v. Morris, 1 Wall. 97, 17 L.Ed. 495." Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 120–121, 44 S.Ct. 274, 276, 68 L.Ed. 582. (Emphasis supplied.)

■■ We already have covered and disposed of plaintiff's contention that the Louisiana Arbitration Law, and Code articles, are remedial. His challenge to the jurisdiction of the official arbitrators, as indicated above, is without merit: first, for the reason that he himself invoked their action and, now that his petition has been denied, he cannot attempt to strike down their decision; and, second, because, as President of the National Association, under the rules by which plaintiff and defendant are bound, Mr. Trautman had express authority to act:

"In cases where a player or club having claim against a club or Minor League shall have complied with the regulations relative to filing such claim with the President of the league against which claim has been lodged against league or club, and said League President fails or refuses to render decision on such claim as required by the National Association rules, then upon request of the player or club directed to the President of the National Association, the President of the National Association shall render a decision by default upon such claim." Rule 10, Executive Committee Rules, National Association Agreement.

■ Plaintiff's objection that the proceedings before the arbitrators were *ex parte* is equally groundless, for two reasons: 1) contrary to his assertion, he *did* receive an exact copy of the pertinent portions of Mr. Peters' letter, informing him as to defendant's position, and 2) he never objected at any time to the manner in which the arbitrators proceeded, nor did he ask to appear before them or to submit additional evidence, thereby effectively waiving any objections he might have had.[10] Courts are extremely reluctant to permit arbitration awards to be impeached or set aside.[11]

With regard to plaintiff's reliance upon the clause of the contract providing for payments to be made to him in the event of his unconditional release, paragraph 5(b) deals with his engaging in other sports. That paragraph, and the pay-

10. 6 C.J.S., Arbitration and Award, § 63, p. 202, n. 36, 37; 6 C.J.S., Arbitration and Award, § 69, p. 209 et seq.; Petrol Corp. v. Groupement D'Achat Des Carburants, D.C., 84 F.Supp. 446.

11. 6 C.J.S., Arbitration and Award, § 103.

ment clause, have no bearing on the present case.

■ Arbitration awards may be set aside only upon the following grounds:

1. Where the award was procured by corruption, fraud, or undue means;

2. Where there was evident partiality or corruption on the part of the arbitrators or any of them;

3. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced;

4. Where the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

Plaintiff does not depend directly upon any of these grounds. He indirectly charges partiality, in contending that the arbitrators' decisions were based solely on defendant's version of the facts. With this we do not agree at all. Actually, there is no dispute about the central facts: Plaintiff bought a saloon, without prior consultation with or permission from, defendant. This was a clear violation of both the letter and spirit of his contract, which required him to give his undivided time and complete loyalty to defendant.

Morally, his action was wrong, too. Although there is nothing illegal in the proper operation of a bar, it was as wrong for plaintiff to enter into such a business as it would be for a preacher or teacher. Such people, and baseball managers, are prominently before the public eye. Their conduct in all things should be above reproach. By his action plaintiff set an unpardonable example before the children and young people in this community. He stigmatized his position and his team. That is still another reason why Mr. Peters was so right in telling plaintiff he had violated his duty, not only to the Ball Club, but to the people of Shreveport.

The award of the arbitrators was right. It is final; complete; binding. In the vernacular of the sport, plaintiff has had his turn at bat and struck out.

Defendant's motion is good. It is sustained and the suit will be dismissed.

Present decree accordingly.